And we have the City of Warren case next please. All right. Good morning. Good morning. Good morning. May it please the court. Daniel Pfefferbaum from Robbins, Geller, Rudman and Dowd here today on behalf of lead plaintiff and appellant City of Warren Police and Fire Systems. I'd like to reserve three minutes of my time for three minutes so it shall be done. Go ahead. Thank you. A plaintiff appeals the dismissal of this securities fraud action against Prudential and certain of its top executives. The district court held that the complaint failed to plead falsity consistent with the requirements of the PSLRA. As set forth in our papers, that finding was an error. This court should reverse and in fact this court should find that both falsity and scienter have been pled consistent with the requirements of the PSLRA. As set forth in the complaint, plaintiff alleges that due to seven months of extremely negative mortality experience and two missed internal quarterly forecasts, Prudential's individual life business segment, in Prudential's individual life business segment, the Prudential issued overstated financial results and falsely assured investors that one, their reserves reflected the company's experience, that there were no systemic issues with mortality or underwriting and that if anything, reserves may be larger than necessary due to low interest rates. By June of 2019, the company has experienced nearly a year of extremely negative mortality development and there were ongoing internal discussions regarding the taking of a significant charge. Nonetheless, at the company's June 5th investor day, defendant and CFO Tangi assured investors that mortality experience over the preceding year had been in the range of normal volatility. This reassurance was false and as revealed just two months later, defendants announced that the company would be taking a $208 million charge within the individual life business segment due to revised mortality assumptions. Counsel, fundamentally the district court's issue seems to be that what's pleaded and largely what the confidential informants address is the negative mortality experience of the defendant. You have to extrapolate from that to the entire individual life segment from the experience past to mortality assumptions going forward and then from the mortality assumptions to the actuarial assumptions involving multiple other factors besides mortality and from there to needing the increased reserve and that that was just simply too attenuated from the perspective of the district court. How do you address that concern and most fundamentally that mortality experience is something different than mortality assumptions, much less actuarial assumptions? Thank you, Your Honor. There are a number of errors that plaintiff believes were made by the district court in constructing that view of the case. I think the most important is to start with the statements themselves because as you said, the allegations pertain to mortality and I'll certainly address the Hartford versus individual life mortality in a moment. But first of all, for example, on June 5th, defendant Tangi doesn't comment on reserves. He doesn't comment on assumptions. He comments on mortality. He says that our recent mortality experience has been in the range of what we'd expect, normal volatility. He goes on from that in the very next words to say that it's negative. You're correct, Your Honor. He says slightly negative and we're taking a look at that. But that, I mean to the extent that defendants are suggesting that was a warning, they have not made any effort to satisfy the bespeaks caution doctrine or the PSLRA safe harbor. And in fact, those doctrines would not apply here because we're talking about a historical statement of mortality. Defendant Tangi is discussing what has happened over the preceding year. And mortality is simply a metric. It's not a, we're not talking about what are the assumptions going forward for the next year. We're talking about what happened previously. And I'd even note that if you look at his language, he says our mortality experience has been. He's talking about the past. So to the extent. But he's also talking about the past, not just with respect to the Hartford block. Right, right. I mean your case goes up a lot if he made that statement with respect to only the Hartford block. But he made that statement with respect to the individual life business of which the Hartford block is just a component. Correct, Your Honor. So first of all, the standard is defendant Tangi does not have to address the Hartford block specifically. The statement about individual life mortality was false and misleading. We know that because just eight weeks later, individual life took a $208 million charge. Individual life announced that there were, or Prudential announced there would be a $25 million per quarter charge in perpetuity for individual life. And we note that that erased a third of the anticipated earnings for individual life as a whole going forward. But if you have to go there two months later, why doesn't that feed into the concern the district court had about fraud by hindsight? Why don't we focus on the actual statement on June 5th? Because while he talks about the range of what we'd expect normal volatility, he then says, but net, it has been below our expectations. And I can't comment yet because the work is not complete. How is that distinguishable from city of Edinburgh, where the study was not complete? Language that seems even stronger that we wouldn't move to the third study unless the results of the second were spectacular, was deemed not to be actionable. Your Honor, here we have alleged that internally it was already known that individual life had missed three consecutive internal forecasts. That it had suffered from almost a year of extremely negative mortality results. And that's demonstrated by the company's own sensitivity analysis. I'm sorry, but are you talking about Hartford or individual life? Because I thought Q1 of 2019, individual life was actually up. Thank you. And I'm glad that you addressed that because the court did not properly assess the statement in the Q1 2019 10Q. That statement was about mortality experience with respect to new business underwriting. And we alleged that that was a false and misleading statement because the company addressed the effect of mortality on a very small set of new policies that they wrote that quarter, while omitting the effect of mortality on their entire individual life book of business, which was extremely negative. And the court did not properly credit the allegations in the complaint that that statement was false and misleading. Instead, the court drew a factual inference against plaintiff that in fact mortality in individual life was a benefit that quarter. That conflicts with the well-plaid allegations. It also conflicts with any logical inference. So that was released in May. Just by one quarter later, you're having an announcement of a historically large reserve charge, $208 million that was supposed to happen. That was 0.3% of the time that was theoretically possible. So you're looking at- And you submit that that's outside the range of normal volatility? 100%, Your Honor. That's far outside the range of normal volatility. And I think it's also- If a person hears it's in the range of normal volatility, they aren't thinking to themselves, oh, there's a 0.3% chance. They're thinking that you're kind of in the heartland of what odds would be, right? You're absolutely right, Your Honor. And this is a very interesting case because the company provided a sensitivity analysis, a statistical analysis that told investors one standard deviation was $55 to $80 million. I mean, in other words, they provided a mathematically quantifiable sense of what is normal volatility. So it seems to me that if the June 5th Investor Day statement is read in connection with the sensitivity analysis, maybe independently, it might be more ambiguous. But if you read it in connection with the prior sensitivity analysis, it said the only way this is going to happen is 0.3% chance. And this one says we're in the normal range eight weeks beforehand. That begins to look a little bit more like you aren't in the normal range, and maybe that is false. Well, Your Honor, respectfully, I fully agree that the sensitivity analysis provides that layer of context. But I would also say that even without the sensitivity analysis, for example, I understand that the analyst said in reacting to the Investor Day presentation, individual life mortality experience has been within the range of normal volatility. They repeated that. And then they were shocked just eight weeks later and said that the disclosure of the charge was inconsistent and the company should have used its Investor Day to, I believe said specifically that they should have disclosed this very information on the Investor Day. But if the sensitivity analysis was different, then the statement on June 5th would maybe be, your case would be dramatically weaker with respect to, the sensitivity analysis said something completely different, not 0.3% chance, but 39% chance, then being in the normal range, everyone's on notice and it's a different game. So it seems to me that you need that sensitivity analysis to overcome any ambiguity that there would otherwise be with respect to your Investor Day statement. Again, I believe that the statement is still materially misleading based on the magnet that... But a lot of that's the eight weeks. A lot of that's the eight weeks. If it was 80 weeks, it wouldn't be as misleading. Certainly. So you're benefiting from... The temporal proximity of the statements. Absolutely. And I would note, as we noted in our papers, there is no intervening event that Prudential ever points to. There's no suggestion that there was suddenly some sort of catastrophic mortality experience during those eight weeks. And in fact, we know they were accounting for the mortality that had been taking place over the prior 12 months. What is there in the complaint that indicates that beyond accounting for mortality experience in the Hartford quarterly, which you certainly have pleaded, that the information as to the ultimate actuarial assumptions were being communicated to management? I'm sorry. I don't think I understood the question. What is intervening, if anything, is the conclusion of the annual review of Q2. So what do we have... You're pointing to the quarterly monitoring of the mortality experience of Hartford, but what does that tell us about their knowledge or review as to the ultimate actuarial assumptions informing the reserves? So it's important... The district court found that the company couldn't know the repercussions of mortality experience until the actuarial assumption review was complete. And I think that that's what your question is going to. And that finding was in error. And it conflicts... And I'll also note that defendants don't fully embrace that position because it would suggest essentially that they are flying blind for 12 months of each year because they can't figure out what's going on with the effect of mortality. But I would point the court both to the company's risk warning, which is paragraph 40 at Appendix 66, which connects the negative mortality experience to the need to increase reserves. And I will just read here. This is referring to mortality trend. If this risk were to emerge, the company would update its assumptions used to calculate reserves for enforced business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims. In other words, the company is directly connecting negative mortality experience to the need for additional assets to pay off earlier than expected life claims. Is that the 8K? I'm sorry. That's the 10K, the February 10K. I would also point you to the sensitivity analysis because the sensitivity analysis provides a very clear connection between mortality and the need to increase reserves. In fact, it says one standard deviation in mortality is going to require $55 to $80 million in additional reserves. So going back to paragraph 40, what here indicates that that needs to be done on less than an annual basis?  The issue is whether or not the statements made were materially false and misleading. And so when the company says, we incorporate experience into calculating our reserves, or if the company says, if anything, our reserves may be larger than net liabilities, those statements are rendered materially false and misleading by the failure to disclose this liability. It's not our position to tell the company how it should have acted. The point is that it did neither of those things. And so it had this rapidly growing liability that it did not disclose either by taking it into account or simply telling investors there's materially negative mortality experience occurring in the individual life. And it's, you know, it comes from the Hartford block, which previously caused very large charges in individual life in 2016 and 2017. So this question may go perhaps more to Sientra, but may also inform falsity. And that is that where do we have, you keep talking about the extreme negativity, where is there any quantification of that as to the effect on the Hartford itself, the Hartford on individual life, even the percentage that the Hartford constitutes of individual life? Is that in any documents that on a motion to dismiss we can consider? So Your Honor, I point you to paragraph 53D and 53E, which are the accounts of the former employees who indicate that because of, that the Hartford block experienced negative mortality for the seven months between June 2018 and the start of the class period in February 2019, and 53E, where that negative mortality in the Hartford block caused individual life to miss its internal forecast for four consecutive quarters, two before the class period, two during the class period. And then we also have the fact that by May 2019, it's alleged that the, there was already a, there were already discussions of a significant charge within individual life as a whole. But what does that mean, significant charge? Do we have a quantification anywhere of the developing extent of the shortfalls, or as I asked before, any, the percentage that the Hartford constitutes of individual life? Your Honor, there, we know that the Hartford block represented $141 billion in face amount. We know that it caused the $208 million charge. We know that the $25 million charge per quarter going forward is going to wipe out a third of the individual life income. What does it suggest that all of that is tied to the Hartford? I'm sorry? What, what, what, what supports your, your argument now that all of that was tied specifically to the Hartford? Well, Your Honor, the defendants upon announcing this information, right, acknowledged that the charge was primarily due to negative mortality in what they described as older universal life policies. Again, the charge was taken by individual life as a whole, and we believe that, you know, the statements as to individual life as a whole were false and misleading for omitting this information. But the company said older, older policies, universal life policies, and those analysts understood that to be the Hartford block because that, those were the descriptors used when they acquired the Hartford block in previous years. And I'd also note that there, there were, the company took charges in 2016 and 2017 due to the same problem, but told investors these were one-off charges, these won't repeat that, and, and so from, from that standpoint, no, the company didn't say Hartford block, but they used descriptors that the market generally understood as the Hartford block. I, I'm currently over my time. If there is, if the, if the court would, what was that? Can you talk a bit about Sienta? At the beginning, you talked about Fall City and Sienta, and we, obviously the district court focused its attention on Fall City. Certainly. We have to focus on a strong inference of Sienta. Help us on that. Absolutely. Obviously, this case presents some very unusual facts, particularly with respect to the June 5 statement. This is a case where the temporal proximity between Defendant Tangi's statement and the disclosure of the truth is, is such a short interval, and the disparity is so large. You know, Avaya certainly says that, you know, what, what ultimately disclosed bears on what, what was ultimately disclosed, you know, bears on what the speaker should have known at the time. I would also, you know, direct the court to look at the admissions of the executives when they disclosed the charge. They acknowledged that their internal forecasts, that they were no longer consistent with what they had, the expectations they had set for investors. Do those terms of those fall into the category of subjective judgments? You know, Prudential, the district court alluded to the methodology for setting assumptions involving, involve some subjective judgments, and if that's so, does it fall within Omnicare, or how, how should we think about that? So, so Your Honor, then going back to the falsity and the Omnicare issue, is that, is that the question? So with respect to... Well, yeah, I mean, just as you started talking about statements, you know, obviously judgments might come up naturally. There, I think the, the district court adopted a theory of plaintiff's case and said it was about the sufficiency of reserves, and then summarily applied Omnicare to all the statements. And that, that was an error, because the PSLRA requires that plaintiff plead each statement with particularity. And here, where the statements are examined as pled, certain statements simply are not about reserves. They're not subjective statements. I would say defendant, the June 5 statement from defendant Tangier about their historical mortality over the preceding year is not a subjective statement. It's a statement about a metric they used to measure how many people have died in the preceding year. The statement by defendant Falzon that there are no systemic issues with underwriting or mortality, not a statement about reserves, not a statement that should be covered under Omnicare. Can that be attributed to him when it's an analyst report that just says that he noted this? It's not even quoting him. What do we make of that? So, Your Honor, with respect to the Janus issue and the statement in the analyst report, yes, you can absolutely attribute it at this stage of the litigation to defendant Falzon. And Janus says, attribution within a statement or implicit from surrounding circumstances is strong evidence that the statement was made by and only by the party to whom it is attributed. Here, the statement, the analyst report says, Mr. Falzon noted that there were no systemic issues with underwriting or mortality assumptions. At this point, that is enough to satisfy Janus. I thought Janus said the maker of the statement is the person or entity with ultimate authority over the statement. So, as Judge Krause alluded to, if the speaker is referencing to a written document or report, doesn't it then show up as a reference to that person who doesn't have ultimate authority? The allegation is that this is a direct quote of Mr. Falzon as presented in an analyst report. And for this stage of the litigation, discovery will show there may be a transcript of the presentation. Mr. Falzon may have had notes that had those exact words in it. The Valiant Pharmaceuticals case that we cited for the dispute over ultimate authority for a statement is an issue for discovery. And I'd even point the court to the Burlington Coat case, then Judge Alito, who noted in that case that plaintiff is not indirectly trying to attribute analyst prediction to the company, but directly attacking the defendant's own statement as it was reported by Reuters. And as far as defendant's argument that it requires quotation marks for attribution under Janus, they cite a pre-Janus case that doesn't hold that. And there's no reason here why we haven't alleged with sufficient particularity that Mr. Falzon made this statement under Janus sufficient for this stage in the pleading. What if we're, hypothetically, if we were persuaded that there were particular statements that met the threshold, but they only took you back to a date that's different in the beginning of the class period, what consequence would that have for our disposition? In other words, one of the things that the court did, in addition to parsing which statements, was to actually confine the class period to a different segment of time. Would that be, was that appropriate? And would it be appropriate here? Well, yes, Your Honor. Were the court to find that the first actionable false statement in this case occurred later than February of 2019, whether that was Mr. Falzon's statement in March of 2019 or Mr. Tangi's statement in June of 2019, it would be, the consequence of that would be a smaller class period. And there is no inherent problem with the court finding that, no. One other question, I'm sorry, on the issue of leave to amend. Yes. Because this has already been amended once. And on that issue, we've reviewed for abuse of discretion. Why under these circumstances would it be an abuse of discretion for the plaintiff if you had a first and second chance and no more? Two points on that. With respect to leave to amend, it is true this is an amended complaint. However, the first complaint was filed under the PSLRA's lead plaintiff procedures. So this is the first, the amended complaint is the first time plaintiff has received any review of leave is abuse of discretion. But review of futility, which was the grounds on which the district court found amendment, denied amendment, is reviewed de novo. And as we pointed out in our papers, there are, for example, you mentioned earlier, certain facts that the district court believed would assist it in making a determination. One of individual life business segment that the Hartford block made up. That is the type of factual particularity that could be addressed on an amendment. But again, this was the first commentary that the plaintiffs had received on the allegations from the court. Thank you. Thank you, Your Honors. Thank you. Good morning, Your Honors. May it please the court. Maeve O'Connor, Debevoise and Plimpton for the defendants' appellees. This case, as a securities class action, is subject to a very high pleading bar, especially because it is based on Prudential's judgment-based actuarial processes for estimating its future life insurance liabilities. And in an effort to meet that pleading bar, the plaintiff makes some significant assumptions that are not supported by well-pleaded facts in the complaint. And the first is that negative mortality experience in the near term necessarily means that the company's future reserve assumptions need to be adjusted, means that the reserves are only extremely negative mortality, something that would occur three times in a thousand years, as the plaintiffs put it, could have led to the actuarial judgments that resulted in the charge at issue. These assumptions have no factual support in the complaint, as I'd like to walk through, but they are the crux of the complaint. That's what the complaint depends on. And of course, the claim is based on a reserve charge that was expressly attributed to being a result of the company's annual review of its actuarial assumptions. And apart from acknowledging that the company reviews its assumptions on an annual basis, and that that assumption review resulted in this reserve charge, there's nothing alleged about the assumption review process at all. Nothing about how it works. Nothing about what assumptions were or weren't So instead, the plaintiff bases its claims entirely on allegations regarding negative mortality experience in the Hartford block. Isn't there a connection between the experience and assumptions? There can be a connection, but there's not necessarily a connection. You can imagine many reasons why mortality experience might be volatile or might be moving around. There could be a couple of very large claims in one quarter. There could be a flu season. There's things that can happen that don't necessarily mean that looking way out into the future, you haven't pointed at the right amount of reserves. If you can focus us, if you would, given the facility in which this can be explained, in an eight-week period, we go from a comment that is not at all concerning to a $208 million charge with the prospect of a $25 million charge per quarter for some undetermined amount of time. Help us with that, because there are certain inferences, I think, that one could reasonably draw from hearing those facts, but of course unadorned by the now explanations. Sure. Well, thank you, Your Honor. There's a couple of pieces of that. One is whether plaintiffs have pled that anything about Mr. Tangier's June 5th statements was false. And the other is whether they're entitled to an inference based on temporal proximity. And I'd like to address both of those, if I may. They haven't alleged that anything Mr. Tangier said is false. He said that mortality experience is slightly negative. He said our assumption review process is underway and we're working on it. There's nothing prior to that, nothing, that quantifies the mortality experience that plaintiffs are describing as extreme. What about the statement, our recent experience has been in between range of what we'd expect, normal volatility. Well, I think you have to read the statement in its entirety. It's been in between the range of what we'd expect, normal volatility, but it's been slightly negative. Someone asked, I'm sorry, are you saying that it's been favorable? No, he says. It's been slightly negative and in our thorough process we're looking at that. And I think the overall import of his statements is mortality is slightly negative overall. We're in the middle of our assumption review process and we're going to take a look at it. We said in Shapiro, talking about loan loss reserves, that it's not necessarily a securities violation to fail to have adequate reserves, but once you characterize them, once you quantify them, that you put that in play. By saying that it was slightly negative, why isn't that sufficient to characterize or quantify the loss reserve? Well, I think he's talking about experience, he's not talking about reserves, would be my first response. And the second is he's talking about experience for individual life as a whole and there's no allegation that that's negative, that that's more than slightly negative, I apologize, that that's not accurate. How do we square that with the attribution after the fact that individual life was what triggered the need for the charge? Well, let me maybe look at it this way, Your Honor, if I can, because I think it might be helpful. Why is it that the plaintiff is asking this court for an assumption that only extreme mortality could have driven that charge, and therefore what Mr. Tanji said is wrong? Why would that be? This is a book of business, $141 billion is what's alleged, and why would it not equally be the case that a small adjustment amplified over a large book of business could result in a larger charge? There's nothing that suggests that this was necessarily extremely adverse mortality, it's purely an assumption, and it's an assumption that is absolutely key to their case. They need that assumption because otherwise, they have no basis, they have no facts to suggest that Mr. Tanji's statements were not true as made. Nor can they rely on temporal proximity to get there for a few reasons. One is that, and first of all, temporal proximity is not a stand-alone basis for a say-enter allegation. It can contribute if there are other bases for say-enter, but it's not a stand-alone ground. Second of all, the temporal proximity cases are all circumstances where a fact is stated, and then it is revealed that that fact is not true. Here, there's no inconsistency. Can I just back up? I'm sorry for interrupting your temporal proximity, but I just want to go back to the notion that plaintiffs are making this huge assumption that it's based on negative mortality. And so I guess my thought is, I can kind of see that this could be due to one-time sort of events, not kind of more systemic sort of just negative mortality in a portfolio, if it was a one-time kind of change. But as Judge Greenaway said, there's this kind of lingering tale of $25 million. And so if it's a one-time sort of thing, then I would expect a one-time adjustment without a tale. But if it's something like negative mortality, which is really just the whole portfolio, not a one-time one or two big charge-offs, I don't know that you have this perpetual tale. And so doesn't the presence of that perpetual tale support the inference or assumption, or pick your modifier there, that they think that there was a link between negative mortality and the reserve change? Respectfully, I'd say no, Your Honor. And I think that the big difference between this and a lot of other cases is the ultimate decision by actuaries to adjust the assumptions resulting in a charge is an actuarial, judgment-based opinion. It's multifactorial, and there's nothing alleged about it. But I guess what I'm saying is, isn't it reasonable to think that actuaries, if it was just a one-time glitch, that they would fix it one time and not do it in perpetuity through a tale? If it's in perpetuity, it suggests that there is an ongoing problem in a way that negative mortality can be an ongoing problem, but one-time charges aren't quite so much that ongoing problem. Well, I don't think I agree with that, Your Honor, because what the actuaries are doing is they're looking at all of the assumptions that project out decades into the future what the impact is going to be, and they're making an actuarial judgment as to what to do about that. But is there an instance where one-time charges would lead to decades into the future $25 million charges off? I mean, that strikes me as decently rare. I mean, it would strike me that if it's just a one-time thing, that you could make a one-time adjustment. But if it was endemic in the portfolio, then the charge-off would have to kind of be linked to the lifespan of the portfolio, and that's what happened here. Well, I think, though, Your Honor, that all of that is actuarial judgment. I think you're just pointing out the notion that there's actuarial judgment. What is happening here? We're seeing some movement in mortality. It's slightly negative overall. Something's happening in the Hartford block. I think it's at that early stage, maybe at the pleading stage, that that consequence says this case could go forward. Not that the case wins. I mean, we can tease out all those assumptions later and see what those were and how those played out. But we're at an early stage of the game. The PLSRA doesn't let too much pass the early stage of the game. But it strikes me that that right there suggests that their key assumption, as you say, that's key to their case, that there's a linkage between mortality and reserves, that maybe there's something to that. So, Your Honor, I'm certainly not saying there's no linkage between mortality and reserves. I'm saying that they're assuming there's a direct line. If there's adverse mortality experience, it means reserves are necessarily understated by a certain amount. And that is not true. That is a factual assumption that's not supported, rather, by any facts in the complaint. If there's extreme adverse mortality, though, then the odds go up dramatically that there's going to be a change in reserves, though, right? That's why the plaintiffs try so hard to use the word extreme throughout their briefs. But it's not supported by any factual allegations. Well, what about the sensitivity analysis that basically says, hey, these are the odds that we're going to have reserve changes. And it says there's a .3% chance that the reserve charges will be in the range that we actually charged. I mean, let's say that statement's 100% true. I mean, the truth of that statement makes it harder for the investor's day statement to kind of still feel true eight months later, when that .3% chance becomes actuality. So I think, Your Honor, the sensitivity analysis goes right back to this issue of mortality experience versus mortality assumptions. And the plaintiffs want that document to do a ton of work. They say it means, and this just comes up in the reply like it's the heart of the case. They say it confirms that the reserves were the result of extreme mortality development. It's really almost the sole basis for that. And they say it told investors that a charge of the sort taken at the close of the second quarter was virtually impossible. The actual document, though, which is Exhibit J to our motion papers, it's at ECF 43-1 at 20. What it states is, for individual life, a one standard deviation change from expected mortality experience impacts annual pre-tax AOI by 55 to 80 million. This illustrates the potential financial impact to 2019 results if mortality experience in individual life that year, the claims the company is going to pay that year based on death reported that year, were to vary by one standard deviation from the company's expectations as of December 2018. And there are no allegations at all as to how mortality experience in individual life that year actually compared to that sensitivity analysis. The analysis says nothing about mortality assumptions, nothing about the assumption review process, nothing about the likelihood of a $208 million charge from that process. It certainly doesn't say, as plaintiffs suggest, that it's virtually impossible that the assumption review process, which isn't even mentioned in the document, will result in a significant charge. It actually has no relevance for change in assumptions at all. It's about mortality experience and sensitivities around expectations on mortality experience. So is it your position that as we hear what the plaintiff has put before us, the $208 million charge, the 25 million recurring charge, that what they suggest is there's a point in time, and then there's another point in time eight weeks later. And eight weeks later, the entire world has changed. And if I understand your explanation, in that eight-week period, well, first of all, the eight-week period isn't a period to look at. It should be a longer period because of actuarial assumptions and other parts of the decision-making process that go into the $208 million. But I guess the question that I have is, I hear that, but they've put forth a plausible argument of how to look at a set of facts, which is not indisputably wrong. Isn't that enough? Well, I guess a couple of responses to that, Your Honor. First of all, obviously, plausibility is not enough to state a plaintiff's securities fraud. I know Your Honor is aware of that. But second of all, I want to focus back on temporal proximity, which I think I was starting to speak about a minute ago. The temporal proximity cases are all about person says fact, and whatever period later fact is revealed to not be true. Here, Mr. Tangi talked about what mortality experience looks like, and he says our process is underway, but it's not done. Eight weeks later, the actuaries have reached a conclusion based on their application of their judgment about where this lands, and they've come up with a charge. That's not inconsistent with what Mr. Tangi said. He said the mortality experience is slightly negative, we have a process underway, I can't comment, we're looking at it. Your adversary said that there was no subsequent report, disclosure of something that catastrophic or the like, I forget the word that he used, during that eight-week period, so how do you get to that number? I'm not asking you how you get to the number, he's making the argument. Life would be a lot different. What I don't get is, so what did happen? Are we to ascribe or attribute the $208 million charge just to a change in actuarial assumptions? He's like, there's nothing that happened, and they haven't disclosed anything that happened, so there's only one inference one could draw from that. Yeah, so this is not a case where, sometimes you have cases where earnings are doing great, and then in the last two weeks of the quarter they tank, or something like that. But here, the actuarial assumption review process was underway, and that's what happened. Mr. Tangi says it's underway, it's not done. And then, obviously, it's done by the time of the earnings release and an announcement's made. And so, it's just the actuaries trying to figure out what do we think the meaning is of what we're seeing. So, it could be underway for a long period of time. I mean, it's an annual review process, as you point out. So, I mean, I guess my thought is, what if Mr. Tangi made the same statements eight days beforehand, eight days before the earnings announcement, and said, yeah, it's still underway, because it would be wrapped up six days before the earnings statement, or five days before. I don't know how it takes to button up an earnings statement. I hear it's a lot of work. But just a certain amount of days before, but we said eight days. It's still underway. Eight days, I mean, I guess your answer would be the same. So what? Temporal proximity still doesn't matter, because he said it was underway, and it was underway. But it strikes me that no, eight days would really, really, really bolster the temporal proximity, and the statement, therefore, that it is underway is not an independent reason to look off temporal proximity. And that would mean that eight weeks would also not be an independent reason to look that off. Well, I think the reason to look off temporal proximity is that it's not inconsistent. The charge being announced is not inconsistent with what Mr. Tangi said, and it doesn't reveal what he said to be false. It just reveals what the actuaries concluded at the end of the assumption review process. It doesn't reveal that Mr. Tangi knew something different at the time, or that what he said about mortality experience was not factual. And so that's why we can't rely on an inference from temporal proximity here. So I guess the thought is as long as he kept it open for the actuaries to change the outcome, then it can't be false. So if he kept it open for the actuaries to change the outcome eight days beforehand, then it couldn't be false? Well, look, I mean, I think that because this is an opinion, you know, it's an opinion posed against a fact. It's not something that disproves the fact. So it's not like any temporal proximity case I've seen. You know, in a scenario where these things are happening much closer together, maybe there's other surrounding facts. I don't know. It's hard to sort of address that. But I think in what we have here, we have no allegations at all about the assumption review process, except that it was the reason for the charges that were taken. All of them, right? It was the reason for the charges. So we have no allegations at all about that process, about its timing, about its course, about anything. And then we have plaintiffs asking for an assumption that because the actuaries reached this conclusion, it means that something that Mr. Tanji said that was factual earlier is false. And the other issue is, you know, it is an assumption that mortality experience was extremely negative, such that – and plaintiffs push really hard on this because they know they need it, right? They had Mr. Tanji saying experience was slightly negative, and we're looking at it, and they don't have any quantification anywhere. So they dig in really hard on this assumption review process, this document – I'm sorry, this sensitivity document, which really can't bear the weight they put in it. It just talks about mortality experience sensitivities for 2019. It's not alleged at all how mortality experience in 2019 stacked up against that document. It doesn't talk about the assumption review process. It doesn't say a charge from the assumption review process is 3 in 1,000 of this magnitude. That's all just argumentation. We make assessments about falsity in the context of all of the information in the complaint. And what do we do with the fact that here the backdrop includes charges that were taken in 2016 and 2017 that are attributed to individual life, coupled with confidential informants saying that we were reviewing regularly the Hartford experience? And then we have these statements from Falzon and Tanji, and Falzon's statement in the Credit Suisse report deals with not mortality experience, but mortality assumptions. So I guess taking those maybe in reverse order, the statements that are attributed to Mr. Falzon are not actionable, and they're not actionable because of Janice. And the cases that they cite, what Janice clearly says is that the maker of a statement for purposes of 10B is the entity with authority over the content of the statement and whether to communicate it. It's not even in quotes. It's a characterization of something that Mr. Falzon said, and the only cases that plaintiffs are citing to suggest that this is actionable, they have a Northern District of California case that cites a pre-Janice Ninth Circuit case and doesn't discuss the impact of Janice at all. They also just cited Burlington Coat Factory. That's a case where the company adopted a statement in the analyst report, said, yes, we're comfortable with that. But Mr. Falzon's statement as characterized in this analyst report over which he had no control is not actionable. Looking back, I'm not sure what earlier mortality charges have to do with this, because those are different assumption review processes, and there's no facts alleged to suggest that something about that meant that there's an issue during the class period. I feel like I might have forgotten a part of your question. I'm sorry. Well, let's stick with this part for a second, because if there are continuing problems with the Hartford Life experience that are requiring that there be charges attributed to it in the prior years, and there's the allegations of the regular quarterly monitoring of that experience, why doesn't that, as a backdrop, make it sufficient where someone is saying that it's, for example, just slightly negative within the range of what we'd expect to be a false statement? It's just not nearly enough under the securities laws. It's a very, very high bar to plead a case under the PSLRA in general. It's a very high bar under Omnicare to plead a claim based on reserves, and the Supreme Court has said it's almost akin to a scienter standard to get to a misstatement under Omnicare, and the Supreme Court has said it is no small task for an investor to meet that bar. They haven't met it. They have confidential witnesses who say things like people were looking at mortality experience. I would hope that people are looking at mortality experience and all kinds of other things in the running of a company, but nothing about that supports an inference of scienter or falsity. They also have one of the former employees saying that as early as May of 2019, there were internal discussions about the need to take a significant charge. Yes, and that one, thank you for raising that one, that one is not a sufficient basis to support a securities fraud claim. Who was talking? What exactly were they talking about? Was that the assumption review process? Was it something in a quarter? Was it somebody with any authority to speak on the point? Was it somebody who knew something? Was it a decision? I mean, there's just not really enough there to tag that as a basis for the whole complaint, and I think that Judge Chester was absolutely right to say that that statement is too conclusory. It's also not corroborated by anything, and often confidential witness statements, people will say, well, it's okay because it's corroborated by something. There's nothing that corroborates that the company in May of 2019 was taking a charge. So is it your position that that statement should get no weight, or is it your position that that statement should just get very, very, very little weight? I'm not sure that for my purposes it makes a difference, Your Honor. I think that it should be very, very, very heavily discounted, but I think really it's just too conclusory to support a claim. It doesn't give enough, and there's two pieces to thinking about a confidential witness, of course. One is, has enough been done to identify the person? The other is, have they said something that is not conclusory and is actionable? There's just not enough there. It was discussed that there was any, by whom? This is a whole actuarial judgment process. Who was in the room? What did it mean? I mean, there's really, it's much too vague, and it would become like the little tiny read that a whole securities fraud class action is pinned on. There's just not enough there, respectfully, under the law. I think I'm well over time. Yes, you are. Okay. I know that I will take that as my cue to pack up my things and go. Thank you all very much. I'm sorry, counsel. I did the same for your colleagues, so I'll give you the chance to. On leave to amend, could you briefly address that? Sure, Your Honor. So, look, I think the district court did not abuse its discretion in denying leave to amend. The case does rest on a false premise that mortality experience allegations is sufficient to state a claim for securities fraud here. And this court has made clear that where a plaintiff seeks leave to amend from a district court but doesn't attach an amended pleading, the court doesn't abuse its discretion in denying leave to amend. And this court has said that's because district courts are not required to be mind readers. And I think it's significant here that they didn't go to the district court and ask leave to amend. And they took their chances with this court, but they still haven't identified anything new. They've just sort of said, I could clarify that allegation. They haven't identified anything new that they would say. And I think that Judge Hesler was not required to read their mind on this, and this court isn't either. I think there's no abuse of discretion here. Thank you. Thank you. We'll hear from Counselor Roberto. Thank you, Your Honors. I'll keep this relatively brief. I just want to make a few points in response to Ms. O'Connor's argument. First, with respect to the former employee accounts that are alleged in the complaint, we've set forth in our papers, we've pled consistent with a via the elements that need to be set forth to plead an unnamed witness with particularity. That's the duration of employment, the time period when the former employee acquired the information, and how they had access to that information. Those elements we satisfied. We pled aware of that standard. And so her suggestion that FE1's account of a May 2019 meeting should be discounted is not accurate. And I would point out that that's in paragraph 30, as well as paragraph 53D. And he describes who attended that meeting, as well, and its circumstances, and that it was a regularly held meeting. I'd like to just touch very quickly on the disclosures that were made at the end of the class period. Because, Judge Phipps, you noted the $25 million recurring charge. And I'd just point out that was $25 million per quarter into perpetuity. So we're talking about a $100 million charge per year going forward. And with respect to the idea that that was related to endemic problems in the business, I'd particularly point you to Appendix 84 to 85, where prudential executives note in talking about that charge, they said they contrast that new business that they've been writing over the last few years. In other words, they changed their standards a few years ago, has been priced using much more current assumptions. And they said that are very different from the assumptions used to price the legacy products that have generated some of the recent charges taken. The legacy products, those are the Hartford products. And the ones that have generated some of the recent charges. Again, referring back to those 2016 and 2017 charges. Lastly, I just want to touch on the matter of inferences. Ms. O'Connor has suggested that there's nothing in the complaint about mortality experience at all. Again, point the court to paragraphs 53B, D, and E. And she has posed that something may have happened between June and July that would explain this charge. That is an inference in light of the well-pled allegations about the mortality experience in the Hartford block. It's not permitted at this stage of the litigation. The inferences have to be drawn in plaintiff's favor. Plaintiff has alleged that mortality experience had been negative quarter over quarter. That it caused individual life to miss its internal forecast quarter over quarter. And it ultimately culminated in this charge. The idea that, as she suggested, that the actuarial review took a year of normal mortality and turned that into a $208 million charge. Something that was supposed to only occur 0.3% of the time. It's just not an inference that's permissible at this stage of the litigation. So if the panel has no more questions for me, I'm out of time. So I will rest. Thank you. Thank you. And thank all counsel. We're going to take the matter under advisement. And our panel will take a brief break. And we'll come back and hear our third case.